Filed 10/24/24  P. v. Thompson CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DARINEL STEVEN THOMPSON,<br><br>    Defendant and Appellant. | B332362<br><br>(Los Angeles County<br> Super. Ct. No. NA116600) |

APPEAL from an order of the Superior Court of Los Angeles County, Daniel J. Lowenthal, Judge.  Affirmed in part, reversed in part.

Aurora Elizabeth Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Jonathan J. Kline and Herbert S. Tetef, Deputy Attorneys General, for Plaintiff and Respondent.

In June 2023, a jury convicted defendant and appellant Darinel Steven Thompson of one count of raping an intoxicated person (Pen. Code, § 261, subd. (a)(3)),[1] committed while defendant was working as an Uber driver.  In this direct appeal, defendant contends the court erred by admitting a "data points" report tracking the location of his vehicle, a Google map prepared by law enforcement using latitude and longitude coordinates provided in the report, and related testimony as testimonial hearsay.  In addition, he contends the prosecutor engaged in prejudicial misconduct by misstating the evidence in rebuttal argument.  Finally, he argues the court failed to obtain a valid waiver of his right to a jury trial on sentencing circumstances and engaged in improper factfinding when imposing an upper-term sentence.

We conclude the trial court prejudicially erred in imposing the upper-term sentence in this case.  Finding no prejudicial error in any other claim, we affirm defendant's conviction, reverse the upper-term sentence, and remand for resentencing.

## FACTUAL BACKGROUND

**A.    Prosecution Evidence**

1.    *The Charged Sexual Assault*

On the evening of December 30, 2019, Michelle P. and her friend, Alanna B., consumed several alcoholic beverages at a Long Beach bar.[2]  They went to another bar to meet a friend,

---

[1]    Subsequent references to statutes are to the Penal Code.

[2]    For nondisclosure purposes and ease of reading, we initially refer to witnesses by their first names and last initials before using their first names.

Kelsey G., and Kelsey's brother, Casey G. There, Michelle consumed more alcoholic beverages—several shots and several mixed drinks. According to Alanna and Casey, Michelle appeared "very intoxicated" at the second bar. Michelle fell on the floor and at times appeared unconscious. When speaking, Michelle was incoherent.

After seeing Michelle "unconscious for a couple moments," Alanna helped Michelle order an Uber on her phone. Defendant, an Uber driver, responded to Michelle's request. When defendant arrived, Michelle's friends walked her to the car and placed her inside. Michelle could not sit up by herself.

Michelle remembered little of the night in question. She had no recollection of requesting an Uber or getting into defendant's car. Her only recollections were of playing billiards at a bar and a "flash" of defendant's face and penis. Around 3:00 a.m., Alanna received a text message from Michelle's phone stating, "I'm home." Michelle did not remember sending this message or talking on the phone after she got home. Her phone was password protected.

The following morning, Michelle woke up naked in her bed. She looked at her phone, noticed the Uber application was open, and saw a photograph of defendant's face. Michelle then realized her Uber driver (defendant) was the man who had just raped her. Michelle was taken to a local hospital for a sexual assault (SART) examination.

2.    *The Investigation*

The parties stipulated Michelle's SART examination revealed defendant's DNA and semen on Michelle's breasts, neck,

3

vulva, anus, and cervix. The SART examination also revealed bruising to Michelle's arms, legs, and vagina.

The parties further stipulated defendant's cellphone had taken several photographs of Michelle around 1:37 a.m. on December 31, 2019. The photographs depicted Michelle unconscious in bed. When shown the photos at trial and asked what they depicted, Michelle replied, "Me with my head in my pillow, like a crumpled napkin, naked." Michelle had no memory of defendant taking the photographs and did not give her consent for him to do so.

Long Beach Police Department Detective Darlene Wigmore, the investigating officer in this case, interviewed Michelle. During the interview, Michelle stated she had little memory of the incident and did not know how defendant got her phone number.

### 3. *The Prior, Uncharged Sexual Assault*[3]

On January 20, 2018, A.S. was drinking at a Long Beach bar with a group of people, including defendant. A.S. testified she had consumed "quite a few margaritas" and "some shots" at the bar. When the bar closed, the group went to defendant's house.

There, A.S. felt drunk and unwell. Defendant followed A.S. around the house, which made her feel "uncomfortable" and "weird." Feeling worse, A.S. laid her head on a living room couch. Defendant followed her to the couch and told her something she could not recall.

---

[3] The court admitted evidence of the prior uncharged incident pursuant to Evidence Code sections 1108 and 352.

4

The next thing A.S. remembered was defendant having intercourse with her inside a dark room. A.S. panicked right away, pushed defendant off of her, ran out of the room, and cried "hysterically the whole way" back to her friend's house. A.S. went to a hospital and underwent a SART examination.

## B.    Defense Evidence

### 1.    *The Charged Sexual Assault*

Defendant testified at trial. He claimed the sexual encounter with Michelle was consensual. After accepting the Uber request, defendant drove to the bar around 11:30 p.m. and watched as Michelle walked under her own power and got into his car. During the ride, Michelle spoke freely and did not slur her words.

When defendant pulled up to Michelle's residence, he "log[ged] off" and "end[ed] that ride" so that he could receive a new Uber request. Michelle jumped into the front seat and asked defendant to hang out. Noticing a new Uber order and having "15 to 20 seconds to swipe accept," defendant declined. Michelle asked for defendant's phone number and suggested they buy alcohol from a 7-Eleven nearby. Around 12:05 a.m., defendant turned off his Uber application and drove to the closest 7-Eleven. He turned back after a clerk told him it was too late to purchase alcohol.

Defendant dropped Michelle off at her apartment and drove around her residence to find parking. After some time, defendant parked his car and walked back to Michelle, who unlocked her front door to allow defendant inside. Almost immediately, Michelle kissed defendant and began orally copulating his genitals. "A few minutes into it," Michelle picked up a call and

5

said, "Yeah, I'm home. I'm good. I'm here alone." Michelle hung up the phone and pulled up her dress, and defendant inserted his penis in her vagina. Defendant and Michelle had sex on the living room floor before moving to her bedroom where both fell asleep.

Around 1:30 a.m., defendant woke up and checked the time. He took several pictures of Michelle's body as she continued to sleep. Defendant provided different reasons for taking the pictures. During his testimony, defendant stated Michelle had previously given him permission to show her bodywork to defendant's friend and tattoo artist. In conversations with Detective Wigmore, however, defendant attributed the photos "to his usual way of doing things. He sa[id] he always takes photos of the girls he has been with before he leaves."

Michelle woke up and the two spoke for some time. Around 2:30 a.m., Michelle and defendant got dressed and made plans for later that day. Defendant left Michelle's apartment and texted her when he got home.

The parties stipulated that Officer Mark Sun, the first responding officer in the case, would testify that Michelle initially reported "her Uber driver followed her into her residence, and when she woke up, he was still there. The victim was intoxicated at the time and is not sure if a rape actually occurred."

2.    *The Prior, Uncharged Sexual Assault*

Defendant testified about his sexual encounter with A.S. Defendant claimed that encounter was also consensual. Defendant called two of his friends who were present in his home the night of January 20, 2018, to testify in support.

6

## C. Rebuttal Evidence

Detective Wigmore subpoenaed records from Uber and received a "data points" report in response. The report provided latitude and longitude coordinates for defendant's vehicle from 11:50 p.m. on December 30, 2019, to 2:00 a.m. the following day. Detective Wigmore exported the coordinates into a Google map "to see the actual distance [defendant] traveled and the points of indications" listed in the report. Based on the coordinates, defendant took a relatively straight route from the bar back to Michelle's apartment around 12:19 a.m. The coordinates did not reflect travel to a nearby 7-Eleven or circling around Michelle's apartment. Detective Wigmore acknowledged defendant's location might not have been recorded after his application was turned off.

## PROCEDURAL BACKGROUND

By information filed February 8, 2022, defendant was charged with raping an intoxicated person (Michelle) on or between December 30 and 31, 2019 (§ 261, subd. (a)(3)).[4] The information further alleged Michelle was particularly vulnerable during the commission of the offense. (Cal. Rules of Court, rule 4.421(a)(2).)[5]

---

[4]     Rape is defined in relevant part as an act of sexual intercourse with a person who is "prevented from resisting by an intoxicating or anesthetic substance, or a controlled substance, and this condition was known, or reasonably should have been known by the accused." (§ 261, subd. (a)(3).)

[5]     The information alleged two additional factors (Cal. Rules of Court, rules 4.421(a)(1), 4.421(b)(1)) later abandoned at trial.

7

After instructing the jury and submitting the matter for deliberation, the court discussed the aggravating circumstance allegation with counsel.  The court granted defendant's motion to bifurcate trial on the allegation and informed defendant of his options to admit the allegation or proceed by jury or court trial.  Defense counsel informed the court defendant had "indicated he will waive his right to a jury on the aggravating factor, if they convict."  Asked if he would "admit to the aggravating factor that the victim was vulnerable," defendant replied, "Correct."

On June 6, 2023, the jury found defendant guilty as charged.  The court sentenced defendant to the upper term of eight years imprisonment.  (See § 264, subd. (a).)  When imposing the upper-term sentence, the court found defendant's lack of criminal record outweighed by "the aggravating factors, how vulnerable the victims were in this case, [and] of the position of trust that he was in that was violated."  Defendant timely appealed.

## DISCUSSION
## A.    Admissibility of the Data Points Report
Defendant contends the data points report constituted testimonial hearsay, the admission of which violated the Evidence Code and his Sixth Amendment right of confrontation.  As a result, he contends the court erred by admitting the Google map prepared by Detective Wigmore and her related testimony.

### 1.    *Relevant Proceedings*
During the prosecution's rebuttal case, Detective Wigmore was asked whether the records she received from Uber corresponded with defendant's testimony regarding a trip with

Michelle to obtain alcohol. Defense counsel objected for lack of foundation. Following an unreported sidebar conference, the court overruled the objection, finding the Google map admissible as a business record. The prosecutor marked the map as an exhibit, and briefly examined Detective Wigmore before the court adjourned trial for the day.

Outside the presence of the jury, the court granted defense counsel's request to conduct a voir dire examination of Detective Wigmore. Defense counsel asked Detective Wigmore if she knew whether Uber tracked driver locations after the Uber application was turned off. Detective Wigmore stated she did not know.

Outside the presence of the jury the following day, defense counsel clarified his understanding "that Uber only provided data points, which I understand comes in as a business exception." Nevertheless, counsel argued Detective Wigmore was "not the appropriate person" to interpret the data points when exporting them into a map. The court found no such interpretation required and admitted the data points report and map.

When Detective Wigmore's testimony resumed, the prosecutor attached two documents to the previously marked map. The first document, entitled "Certificate of Authenticity of Business Records," was dated and signed by a custodian of records. The certificate, made under penalty of perjury, provided as follows:

> "1.     [I, the declarant,] am a duly authored Custodian of Records for Uber Technologies, Inc. ('Uber'), . . . I am authorized to certify Uber's records of regularly conducted activity.
>
> "2.     I have reviewed the records of regularly conducted activity produced by Uber in response to a search warrant . . . . The attached records are

reasonably accessible to Uber and responsive to the legal process.

"3.    The records were prepared by Uber personnel in the regular course of business or made and kept by Uber's automated systems in the regular course of business.  The records were made at or near the time of the act, condition, or event, as a regular practice of Uber."

The second document, a "data points" report, was a five-page spreadsheet with defendant's "driver name" and numerical entries under columns entitled, "utc timestamp," "lat," "lng," and "original ip."  Detective Wigmore testified the report "included the actual latitude and longitude points" of defendant's vehicle between the time defendant picked up Michelle "through the direction towards her apartment where he ultimately stopped." By "export[ing] the data points of the latitude and longitude into Google maps," Detective Wigmore identified each location on the map, actual distances traveled, and points of indication. Detective Wigmore converted the timestamps from Universal Time Center to Pacific Standard Time.

Detective Wigmore discussed the area and direction of travel on the map, culminating in a drop-off location at Michelle's residence at 12:19 a.m.  The data points report did not indicate travel toward a nearby 7-Eleven or the circling of Michelle's residence.

On cross-examination, Detective Wigmore acknowledged a cover letter attached to Uber's response to the subpoena.  The letter, introduced into evidence by defendant, stated in relevant part:

10

"We write in response to your recent request seeking information. We have conducted a reasonable and diligent search, and were able to locate the following attached information in response to your request. [¶] . . . [¶]

"The GPS data provided is the best available raw location information provided by the driver-partner device's operating system, from the time the trip was requested to trip completion. GPS data is collected every two seconds, or when the driver-partner is actively interacting with the app[lication]. Please note that certain environmental conditions may disrupt a device's ability to capture data."

After reading the latter paragraph to the jury, Detective Wigmore testified she did not know if defendant's location was recorded after "swip[ing] the Uber app[lication] to end the ride."

2. *Governing Principles*

"Hearsay may be briefly understood as an out-of-court statement offered for the truth of its contents." (*People v. Sanchez* (2016) 63 Cal.4th 665, 674 (*Sanchez*).) Hearsay is generally inadmissible unless it falls under an exception. (Evid. Code, § 1200, subd. (b).) The admission of evidence in a criminal trial is also governed by the Sixth Amendment's Confrontation Clause, which guarantees the right of the accused to be confronted with the witnesses against them. (*Crawford v. Washington* (2004) 541 U.S. 36, 54 (*Crawford*).)

The admissibility of an out-of-court statement may require both (1) a traditional hearsay analysis and (2) a Confrontation Clause analysis. (*Sanchez, supra*, 63 Cal.4th at p. 680.) We review the former inquiry for abuse of discretion and the latter de

11

novo.  (*People v. Ramirez Ruiz* (2020) 56 Cal.App.5th 809, 825; *Conservatorship of S.A.* (2018) 25 Cal.App.5th 438, 447 (*S.A.*).)

3.      *Analysis*

a.      *Business Record Exception*

We begin with the admissibility of the data points report under the business record exception.  Under this hearsay exception, "[e]vidence of a writing made as a record of an act, condition, or event is not [inadmissible] when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian . . . testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."  (Evid. Code, § 1271.)  These foundational requirements may be satisfied by affidavit.  (Evid. Code, § 1561; *S.A.*, *supra*, 25 Cal.App.5th at p. 447.)

Before we address defendant's arguments challenging the application of this exception, we question whether any hearsay analysis is required.  Hearsay is defined as evidence of a statement.  (Evid. Code, § 1200, subd. (a).)  "A statement, in turn, is defined as an 'oral or written verbal expression or . . . nonverbal conduct *of a person* intended by him as a substitute for oral or written verbal expression.'  ([Evid. Code], § 225, italics added.)  "'Person" includes a natural person, firm, association, . . . or public entity.'"  (*People v. Goldsmith* (2014) 59 Cal.4th 258, 273–274 (*Goldsmith*).)  A computer-controlled system that "automatically generates and imprints data information . . .  is [not a] statement being made by a person regarding the data

12

information so recorded.  Simply put, '[t]he Evidence Code does not contemplate that a machine can make a statement.' [Citations.]"  (*Id.* at p. 274, citing *U.S. v. Washington* (4th Cir.2007) 498 F.3d 225, 231 ["the raw data generated by the machines do not constitute 'statements,' and the machines are not 'declarants'"]; accord, *People v. Rodriguez* (2017) 16 Cal.App.5th 355, 381.)

Defendant's own evidence—the cover letter attached to Uber's data points report—confirmed each GPS data point listed in the report was automatically generated from a computer system.  It is not clear this evidence is hearsay requiring an exception to be admissible.  However, because this has not been raised by either party on appeal, we address both of defendant's arguments concerning the hearsay exception applied below.

Defendant first argues the certificate of authenticity, which provided that the records "are reasonably accessible to Uber and responsive to the legal process," refuted any notion the data was "either created in the ordinary course of business [or] a report created at or near the time of the events."  We reject this argument for several reasons.

To begin with, defendant's interpretation isolates a selected portion of language in the certificate to the exclusion of numerous statements verifying the records "were prepared . . . in the regular course of business" and "made at or near the time of the act, condition, or event, as a regular practice of Uber."  Defendant does not explain how these explicit statements, which are presumed to be true (see Evid. Code, § 1562), can be negated by the vague statement indicating the documents provided are responsive to a subpoena.  At most, the argument establishes

13

conflicting inferences on authenticity, which goes to weight, not admissibility.  (See *Goldsmith, supra,* 59 Cal.4th at p. 267.)

Defendant has also failed to cite any authority to show the retrieval of data, rather than its entry, must take place at or near the time of the event.  "[A]lthough to qualify as a business record the 'writing' must be made at or near the time of the event, 'writing' is not limited to the commonly understood forms of writing but is defined very broadly to include all 'means of recording upon any tangible thing any form of communication or representation, including letters, words, pictures, sounds, or symbols, or combinations thereof.'" (*Aguimatang v. California State Lottery* (1991) 234 Cal.App.3d 769, 798.)  As discussed, the "writings" at issue here are entries of "raw location information" data into Uber's automated systems.  The certificate and accompanying letter demonstrate each data entry was made at or near the time of the act, condition, or event, as a regular practice of Uber, and not in preparation of trial.  That the data entries were retrieved and provided in a document in response to a subpoena does not alter their status as business records.

Next, defendant argues the data points report was inadmissible absent a custodian or other qualified witness testifying to the mode of its preparation.  (Citing Evid. Code, § 1271.)  Again, we disagree.

"""Whether a particular business record is admissible . . . depends upon the 'trustworthiness' of such evidence, a determination that must be made, case by case, from the circumstances surrounding the making of the record. [Citations.]'"  . . . 'The foundation for admitting the record is properly laid if in the opinion of the court, the sources of information, method and time of preparation were such as to

justify its admission.'" (*People v. Zavala* (2013) 216 Cal.App.4th 242, 246.) "'As long as the evidence would support a finding of authenticity, the writing is admissible.'" (*Goldsmith*, *supra*, 59 Cal.4th at p. 267.)

The certificate of authenticity and cover letter together provide a proper foundation for finding the data points report trustworthy. The certificate confirmed the data points were collected as part of Uber's regularly conducted activity. The certificate and letter verified the data points were collected every two seconds through Uber's automated systems. This evidence sufficiently established trustworthiness of the data points report. (See *S.A.*, *supra*, 25 Cal.App.5th at pp. 447–448 ["it is not necessary that the witness . . . have personal knowledge of every transaction; he need only be familiar with the procedures followed"].)

In sum, we conclude the certificate of authenticity and cover letter reasonably support a finding the requirements of Evidence Code sections 1271 and 1561 were satisfied. (See *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [reviewing courts are to examine the trial court's result and not the reasons supporting it].) The trial court did not abuse its discretion admitting the data points report, and by extension, the Google map and Detective Wigmore's related testimony. (See *People v. Mills* (2010) 48 Cal.4th 158, 207 [courts have "broad discretion to admit demonstrative evidence such as maps, charts, and diagrams to illustrate a witness's testimony"]; *People v. Duenas* (2012) 55 Cal.4th 1, 20 ["'Animations do not draw conclusions; they attempt to recreate a scene or process'"].)

15

b.     *Confrontation Clause*

We next consider whether the data points report implicated the Confrontation Clause of the Sixth Amendment.  The Attorney General contends defendant forfeited the argument by failing to object on this basis at trial.  We agree.  (See *People v. Catlin* (2001) 26 Cal.4th 81, 138, fn. 14 [defendant "did not object on this ground below, . . . his constitutional claim has not been preserved for appeal"].)  Further, when defendant's argument is considered on the merits, it fails.[6]

The Confrontation Clause of the Sixth Amendment provides the accused with the right to be confronted by witnesses who testify against them.  (*Crawford, supra*, 541 U.S. at p. 54.)  Only "*testimonial* statements" implicate the Confrontation Clause.  (*Giles v. California* (2008) 554 U.S. 353, 376.) "Testimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony.  Nontestimonial statements are those whose primary purpose is to deal with . . . some other purpose unrelated to preserving facts for later use at trial." (*Sanchez, supra*, 63 Cal.4th at p. 689; accord, *People v. Tran* (2022) 13 Cal.5th 1169, 1197.)

The data points report did not include or constitute testimonial hearsay.  "Business and public records are generally admissible absent confrontation not because they qualify under

---

[6]     Defendant also contends his trial counsel rendered ineffective assistance of counsel by failing to object under the Confrontation Clause.  Because defendant's Confrontation Clause argument fails, his ineffective assistance claim necessarily fails.  (See *People v. Thompson* (2010) 49 Cal.4th 79, 122 ["Counsel is not ineffective for failing to make frivolous or futile motions"].)

16

an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 324.) As discussed, the data points were generated automatically in the regular course of Uber's business. The data points were not entered into Uber's computer systems to prove facts at defendant's trial. (Accord, *People v. Rodriguez* (2017) 16 Cal.App.5th 355, 382 ["computer-generated GPS data"]; *People v. Dungo* (2012) 55 Cal.4th 608, 583 [blood alcohol data report]; *United States v. Yeley-Davis* (10th Cir.2011) 632 F.3d 673, 677–679 [cellphone records printout].) Defendant's confrontation clause claim fails.

## B.     Prosecutorial Misconduct

Defendant contends the prosecutor engaged in misconduct by telling the jury Michelle's phone "was protected by her thumb," suggesting defendant was potentially responsible for sending the 3:00 a.m. text message to her friend Alanna. Anticipating forfeiture for his failure to object, defendant also argues ineffective assistance of counsel.

### 1.     *Relevant Proceedings*

At trial, Michelle was asked, "Was [your Apple cellphone] password protected?" Michelle replied, "Yes, the phone." Several hours after defendant had sex with Michelle, her friend Alanna received a text message from Michelle's phone stating, "I'm home." Michelle had no memory of sending this message or having the capacity to send it at that time.

17

In closing argument, defense counsel argued "the most crucial thing about this case" was the 3:00 a.m. text message, which demonstrated Michelle's capacity to inform her friend she was safe at home, and by implication, her capacity to have consensual sex.

The prosecutor addressed this argument in rebuttal as follows:

> "There's a lot of well, Michelle must have texted her friend at 3:00 in the morning. Her phone was passcode protected. *Well, her phone was protected by her thumb.* She said that on the stand. I don't know if Michelle texted. I don't know who texted. It could have been the defendant, who knows. But we all do things -- you know, the People haven't argued that Michelle didn't talk at all. People do lots of things when they're intoxicated. That's why we have DUI, . . . . She could have talked. She could have texted. She could have sung and danced; that is not the point." (Italics added.)

The point, according to the prosecutor, was the level of Michelle's intoxication and "that the defendant knew, too."

2. *Governing Law*

Claims of prosecutorial misconduct implicate different standards under federal and state law. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1070.) "Under the federal Constitution, a prosecutor commits reversible misconduct only if the conduct infects the trial with such "'unfairness as to make the resulting conviction a denial of due process.'" [Citation.] By contrast, our state law requires reversal when a prosecutor uses 'deceptive or reprehensible methods to persuade either the court or the jury'

[citation] and "'it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct'" [citation]." (*People v. Davis* (2009) 46 Cal.4th 539, 612 (*Davis*).)

"To preserve a misconduct claim for review on appeal, a defendant must make a timely objection and ask the trial court to admonish the jury to disregard the prosecutor's improper remarks or conduct, unless an admonition would not have cured the harm." (*Davis, supra*, 46 Cal.4th at p. 612; accord, *People v. Thornton* (2007) 41 Cal.4th 391, 454 [objection must identify same ground of misconduct].)

Where, as here, the alleged misconduct arises from the prosecution's rebuttal argument, "'the prosecutor "cannot be charged with misconduct if [her] comments only spill over somewhat into a forbidden area; the departure from propriety must be a substantial one." [Citation.]' [Citation.] '[A] prosecutor is justified in making comments in rebuttal, perhaps otherwise improper, which are fairly responsive to argument of defense counsel and are based on the record.' [Citation.]" (*People v. Thomas* (2021) 64 Cal.App.5th 924, 954; see also *People v. McDaniel* (1976) 16 Cal.3d 156, 177.)

In reviewing claims of prosecutorial misconduct, "we must view the [challenged] statements in the context of the argument as a whole." (*People v. Dennis* (1998) 17 Cal.4th 468, 522.) In doing so, we shall not "'lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.'" (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1225, fn. 21.)

19

"To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense." (*People v. Benavides* (2005) 35 Cal.4th 69, 92–93, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687–688 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216 (*Ledesma*).)

3.    *Analysis*

Defendant did not object to the prosecutor's statement that Michelle's phone was "protected by her thumb." Defendant acknowledges this omission but argues an objection would have been futile. On this record, we do not agree an objection and corrective admonition would not have cured the harm. (See *People v. Centeno* (2014) 60 Cal.4th 659, 67; accord, *People v. Wharton* (1991) 53 Cal.3d 522, 566–569 (*Wharton*).) As such, we consider whether defense counsel's failure to object constituted ineffective assistance of counsel.

For claims in which defense trial counsel did not object to prosecutorial misconduct, "the appellate record rarely demonstrates 'that the failure to object was the result of counsel's incompetence; generally, such claims are more appropriately litigated on habeas corpus, which allows for an evidentiary hearing where the reasons for defense counsel's actions or omissions can be explored.' [Citations.]" (*People v. Salcido* (2008) 44 Cal.4th 93, 152.) "'[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' [Citation.]" (*People v. Chatman* (2006) 38 Cal.4th 344, 384.)

The record here is silent as to why defense counsel did not object to the prosecutor's statement in rebuttal argument. The record does not affirmatively disclose there was no rational tactical purpose for counsel's failure to object. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) Counsel could have reasonably concluded the statement was one of several interpretations drawn from the evidence, i.e., that Michelle's password-protected phone could be unlocked by using her thumb. (See *People v. Valencia* (2008) 43 Cal.4th 268, 284 [a prosecutor may "argue his interpretation of the evidence, just as defendant was entitled to argue his interpretation of that same evidence"].) Counsel could have also decided it best to avoid highlighting the point and making the jury wonder "if there really was such evidence" supporting the prosecutor's comment. (*Wharton*, *supra*, 53 Cal.2d at p. 567.)

Even assuming misconduct, defendant has not established prejudice. The prosecutor's comment was made as a prelude to her larger argument questioning the significance of the text message, irrespective of who authored it. We do not believe the jury, repeatedly having been advised that statements of counsel are not evidence, would have been misled in the manner suggested by defendant. (See *People v. Holt* (1997) 15 Cal.4th 619, 662 [reviewing courts presume the jury followed instructions]; accord, *People v. Collins* (2010) 49 Cal.4th 175, 229 [remarks "were somewhat ambiguous and constituted only a small portion of her larger argument"].) Absent any prejudice, defendant's ineffective assistance claim fails.

21

**C.     Sentencing Error**

As the parties acknowledge, the appellate record is sparse and the facts are few on defendant's waiver of his right to a jury trial on the single aggravating circumstance pursued by the prosecutor (i.e., that Michelle was particularly vulnerable). Nor does the record reveal any explanation of the consequences of defendant's waiver.

Defendant contends, and the Attorney General agrees, the court erred by failing to obtain a knowing, intelligent, and voluntarily waiver. Defendant contends the court further erred by relying on aggravating facts not admitted by defendant or found true by the jury beyond a reasonable doubt when finding the "victims" were vulnerable and defendant violated "the position of trust" he held as an Uber driver. We agree with both contentions and find the errors prejudicial.

> 1.     *Governing Law*

Our Legislature passed Senate Bill No. 567 to require factors in aggravation be pled and proved to the trier of fact before those factors may be used to increase a defendant's sentence. (Stats. 2021, ch. 731, § 1.3, adding § 1170, subds. (b)(1), (2).) Under the amended law in effect at the time of defendant's sentencing, the trial court was required to impose a sentence not to exceed the middle term absent "circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subds. (b)(1), (2).)

22

The California Rules of Court provide a non-exhaustive list of circumstances in aggravation. The list covers circumstances relating to the crime, which include "[t]he victim was particularly vulnerable" and "[t]he defendant took advantage of a position of trust or confidence to commit the offense." (Cal. Rules of Court, rules 4.421(a)(3)), 4.421(a)(11).)

A criminal defendant's Sixth Amendment right to a jury trial "is triggered by section 1170(b)'s substantive requirements governing imposition of an upper term sentence." (*People v. Lynch* (2024) 16 Cal.5th 730, 762 (*Lynch*); § 1170, subd. (b)(2).) Subject to exceptions not applicable here, a jury finding beyond a reasonable doubt "is [ ] required for all facts actually relied on to impose an upper term" sentence under section 1170, subdivision (b). "[A] Sixth Amendment violation occurs when the trial court relies on unproven aggravating facts to impose an upper term sentence, even if some other aggravating facts relied on have been properly established." (*Lynch*, *supra*, 16 Cal.5th at pp. 757–760, 768.)

The right to jury trial may be waived, provided it is express and "'is knowing and intelligent, that is, ""made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it,"'" as well as voluntary ""'in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."'" [Citations.]" (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 166.)

2.    *Analysis*

It is undisputed there was no knowing, intelligent, and voluntary waiver of defendant's right to a jury trial on any

23

circumstance used to aggravate his sentence.  Without obtaining a valid waiver, the court could not impose the upper term based on its own factfinding that the "victims," presumably the charged victim (Michelle) and uncharged victim (A.S.), were vulnerable or that defendant violated a position of trust.  (Cal Rules of Court, rules 4.421(a)(3)), 4.421(a)(11).)  This type of judicial factfinding violated defendant's jury-trial right.  (*Lynch, supra,* 16 Cal.5th at p. 768.)[7]

Our Supreme Court recently clarified the standard of prejudice when reviewing a trial court's erroneous "substitution of its own factfinding for that of a jury. . . ." (*Lynch, supra,* 16 Cal.5th at p. 760.)  The Court held that such violation "is prejudicial unless an appellate court can conclude beyond a reasonable doubt that a jury would have found true all of the aggravating facts relied upon by the trial court to justify an upper term sentence, or that those facts were otherwise proved true in compliance with the current statutory requirements.  If the reviewing court cannot so determine, applying the *Chapman* standard of review, the defendant is entitled to a remand for resentencing." (*Lynch, supra,* 16 Cal.5th at p. 768.)  Under this standard, we cannot "uphold the trial court's imposition of an upper term sentence based on some subset of aggravating facts." (*Id.* at p. 761.)

Applying that standard here, we cannot conclude beyond a reasonable doubt a jury would have found true all aggravating facts relied on by the trial court.  Defendant was not charged with and did not admit the victim of the uncharged offense was

---

[7]     Defendant's failure to object on Sixth Amendment grounds below did not forfeit his ability to raise the issue on appeal. (*People v. French* (2008) 43 Cal.4th 36, 46.)

24

vulnerable or that he violated a position of trust. (Cal. Rules of Court, rule 4.420, subd. (b); see *People v. Aragon* (1992) 11 Cal.App.4th 749, 764 [aggravating sentence "because of an uncharged offense for which there is no conviction . . . violates due process"].) "It would not have been impossible, given the jury's findings and the evidence, for the jury to have found in [defendant's] favor on one or more of these aggravating facts." (*Lynch, supra,* 16 Cal.5th at p. 776.)

The proper remedy for the failure of proof of aggravating circumstances never tried to the jury is to remand for proceedings "to be conducted in accordance with the current statutory requirements and the defendant given the opportunity for the jury trial, of which he was deprived." (*Lynch, supra,* 16 Cal.5th at p. 777.) On remand, the court may obtain a valid waiver of defendant's jury-trial right. In the event the parties proceed to trial, they may introduce "all relevant evidence to support or contest the factual support for the aggravating circumstances . . . ." (*Ibid.*)[8]

---

[8]    In light of our conclusion, we do not consider defendant's alternative contention regarding his request for a continuance to retain private counsel at sentencing under *People v. Marsden* (1970) 2 Cal.3d 118.

25

## DISPOSITION

Defendant's conviction is affirmed. The judgment of the trial court imposing an upper-term sentence is reversed and the matter is remanded with directions to conduct further proceedings on the aggravating circumstance(s) and for the court to exercise its discretion under section 1170, subdivision (b).

MORI, J.

We concur:

CURREY, P. J.

ZUKIN, J.

26